# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,    Case No. 25-cr-091 (SRN/SGE)

        Plaintiff,

     v.    **ORDER & REPORT AND**
**RECOMMENDATION**

ERIC ANTHONY RODRIGUEZ,

        Defendant.

---

Raphael Coburn, Assistant United States Attorney, United States Attorney's Office counsel for Plaintiff.

Glen Bruder, 9531 West 78th St., Suite 210, Eden Prairie, MN 55344, CJA Appointment.

---

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for an order and a report and recommendation on Defendant Rodriguez's Motion for Disclosure / Expansion of Jencks Act Disclosure Obligation (Dkt. 89); Motion for Disclosure of Government's Intent to use Residual Hearsay Exception (Dkt. 90); Motion for Disclosure of Records Relating to Canine (Dkt. 91); Motion to Suppress Evidence Derived from Motor Vehicle Search (Dkt. 92); Motion to Suppress Evidence Derived from Search of Cell Phones (Dkt. 93); and Motion for Hearing Pursuant to *Franks v. Delaware* (Dkt. 94). The Court held hearings on

August 20, 2025 (Dkt. 128) and September 4, 2025 (Dkt. 130).[1] Assistant United States Attorney Raphael Coburn appeared on behalf of the United States of America ("Government"). Attorney Glen Bruder appeared on behalf of the Defendant, Mr. Rodriguez, who was present at both hearings.

## I.    Background

Olmstead County Sheriff's Office Investigator Brenden Rasinski started investigating a drug trafficking organization in August or September 2024. (Tr. at 132.) During that investigation Erick Emilio Diaz-Aguilar's cell phones were seized and searched, and Investigator Rasinski discovered Mr. Diaz-Aguilar communicated often with a phone number associated with Mr. Rodriguez. (Tr. 133.) Investigator Rasinski then searched Mr. Rodriguez's criminal record, and discovered he was on supervised released for a drug offense and had previously been convicted of a drug distribution offense. (Tr. at 134.) Investigator Rasinski also discovered Mr. Rodriguez's Cash App account by viewing publicly available profile information. (Tr. at 134-135.) Investigator Rasinski subpoenaed the Cash App account records which revealed multiple transactions with individuals in the Bemidji and Moorhead area. (*Id.*) Investigator Rasinski testified that he suspected Mr. Rodriguez may be distributing controlled substances to people in that area based on the Cash App transactions. (Tr. at 152.) Based on all of this information, Investigator Rasinski

---

[1] For ease of reference, both the August and September hearing transcripts (Dkts. 135, 136) will be cited as "Tr." followed by the page number identified in the upper right-hand corner of the transcript. The transcripts are currently restricted from public access, but no party has requested any redactions, and this Report and Recommendation does not contain any confidential information or personal identifiers.

obtained a warrant for Mr. Rodriguez's historical phone location data. (Gov. Ex. 17.) The location data confirmed that Mr. Rodriguez had taken multiple short trips to Bemidji and Moorhead—the location of the individuals transferring money to Mr. Rodriguez through Cash App transactions. (Gov. Ex. 19; Tr. at 138.)

Investigator Rasinski next determined that Mr. Rodriguez drove a gold Grand Am, after physically observing Mr. Rodriguez drive the vehicle and subsequently running the vehicle through a law enforcement data base which showed it was registered to the address on Mr. Rodriguez's license. (Tr. at 139.) Investigator Rasinski then applied for and obtained a tracking warrant for Mr. Rodriguez's Grand Am. (Gov. Ex. 18, Tr. at 138.)

The tracker on the Grand Am demonstrated that Mr. Rodriguez met with Mr. Diaz-Aguilar on November 22, 2024, three days before the stop at issue. (Tr. at 150; Gov. Ex. 19 at 47.) Then, on November 25, 2024, the day of the traffic stop, law enforcement noticed the Grand Am had departed the Twin Cities and was heading towards the Bemidji and Moorhead area. (Tr. at 140.) Investigator Rasinski believed that Mr. Rodriguez was transporting bulk amounts of methamphetamine, so he contacted Bureau of Criminal Apprehension ("BCA") agents Garrett Dietman and Dan Skoog. (*Id.* at 142-43.) Investigator Rasinski briefly explained the drug trafficking investigation and Mr. Rodriguez's involvement to Agent Skoog, asking that the Grand Am be stopped and law enforcement seize controlled substances and cell phones. (*Id.* at 143-44.)

After receiving this information, Agent Skoog called Otter Tail County Deputy and K9 Officer Kelby Jensen and requested the Grand Am be stopped. (*Id.* at 91.) Agent Skoog also contacted Minnesota Highway Patrol Trooper Kyle Hanson for assistance in stopping

the gold Grand Am. (*Id.* at 16.) Agent Skoog informed Trooper Hanson of what Investigator Rasinski had relayed to him—that law enforcement had been tracking the Grand Am and Mr. Rodriguez and believed the vehicle contained methamphetamine. (*Id.* at 16, 59-60.)

Trooper Hanson spotted the Grand Am near exit 54 on Interstate 94 and began following it. (*Id.* at 17.) Trooper Hanson observed the Grand Am cross over the center line of the highway, and weave within its lane. (*Id.* at 17-18; Gov. Ex. 9 at 0:53.) Trooper Hanson then drove next to the Grand Am and observed a phone holder attached to the windshield below the rearview mirror. (*Id.* at 17-20; Gov. Ex. 9 at 4:40-45.) After observing these infractions, Trooper Hanson initiated a traffic stop. (*Id.* at 21.)

Once the Grand Am was stopped, Trooper Hanson approached the passenger side of the vehicle and requested identification and proof of insurance, which took Mr. Rodriguez around four minutes to provide. (*Id.* at 21; Gov. Ex. 10 at 2:40-6:43.) As Mr. Rodriguez was looking for the documents, Trooper Hanson observed two phones in the vehicle and noticed that Mr. Rodriguez had bloodshot and watery eyes. (Tr. at 22-23, 65.) Trooper Hanson testified that bloodshot and watery eyes and weaving over the center line are potential signs of intoxication. (Tr. at 14-15.) Trooper Hanson took the license and proof of insurance back to his patrol vehicle to verify the insurance and check for outstanding warrants—a process that took about three minutes. (Tr. at 23, 45-46; Gov. Ex. 9 at 12:40-15:16.)

As Trooper Hanson was running the information, Deputy Jensen arrived on scene with his canine, Koa. (Tr. 23.) Trooper Hanson informed Deputy Jensen that he believed

4

Mr. Rodriguez had blood shot and watery eyes and Trooper Hanson returned to the driver's side of the vehicle to get a better look. (Tr. at 23-24; Gov Ex. 10 at 9:40-50.) Once Trooper Hanson confirmed that Mr. Rodriguez had bloodshot and watery eyes, he had Mr. Rodriguez complete field sobriety tests, a process which lasted about ten minutes. (Tr. at 24; Gov. Ex. 10 at 10:03-19:00, Gov. Ex. 9 at 15:35-24:30.) During the walk-and-turn test, Trooper Hanson observed some indicia of impairment but did not believe he had probable cause to arrest Mr. Rodriguez for driving under the influence. (Tr. at 25.)

After the field sobriety testing, Trooper Hanson spoke with Deputy Jensen about Mr. Rodriguez's performance. (Gov. Ex. 10 at 19:09-20:10.) Deputy Jensen then approached Mr. Rodriguez, asking questions about controlled substances and for consent to search the vehicle, which Mr. Rodriguez denied. (Gov. Ex. 14B at 1:12-20 (Jensen speaking with Rodriguez); Tr. at 94.) Upon receiving this denial, Deputy Jensen returned to his vehicle and called Investigator Rasinski to discuss the next steps, a conversation that lasted about five minutes. (Tr. at 28, 94-96; Gov. Ex. 15 at 13:10-18:05 (Jensen walking to vehicle and then walking back to Rodriguez).) In the call, Investigator Rasinski told Deputy Jensen they could use the information they had regarding the investigation to perform a dog sniff. (Tr. 96-97.) Specifically, Investigator Rasinski indicated that the driver of the gold Grand Am was the target of a narcotics investigation where he was suspected of trafficking large quantities of controlled substances from the metro area to the Fargo-Moorhead area. (Tr. 95-96.)

Based on Investigator Rasinski's knowledge, Deputy Jensen performed a dog sniff around Mr. Rodriguez's vehicle with his canine, Koa. (*Id.* at 97; Gov. Ex. 9 at 32:40-33:56;

Gov. Ex. 14C at 1:43-2:52.) During the approximate minute-long dog sniff, Koa alerted to the presence of narcotics by (1) investigating odors on his own instead of following Deputy Jensen's hand,(2) snapping his head towards the rear wheel well, (3) "bracketing,"[2] and (4) going onto his hind legs to sniff the open window. (*Id.* at 100-102; Gov. Ex. 14C at 1:43-2:52.) Additionally, according to Deputy Jensen, Koa gave two final indications for the presence of narcotics when he briefly placed his stomach close to the ground. (*Id.* at 100-05, Gov. Ex. 14C at 2:28-29, 40.) Based on Koa's alerts and indications, Deputy Jensen determined there was probable cause to search the vehicle for narcotics. (*Id.* at 106.) During the search, Deputy Jensen found and seized approximately three pounds of suspected methamphetamine inside a bag in the Grand Am's trunk. (*Id.* at 29, 107, 123.)

Once the methamphetamine was seized, Trooper Hanson issued Mr. Rodriguez a warning for both traffic violations and allowed Mr. Rodriguez to leave. (Tr. at 29.) After Mr. Rodriguez left, Investigator Rasinski was notified that three pounds of methamphetamine were seized, but no cell phones were seized. Believing the phones contained evidence of drug trafficking, Investigator Rasinski requested law enforcement stop Mr. Rodriguez again to seize the phones. (Tr. at 146-147.)

Trooper Hanson then contacted Trooper Ophaven, requesting he initiate a stop of Mr. Rodriguez, explaining the need to seize the two cell phones Trooper Hanson previously saw inside Mr. Rodriguez's Grand Am. (Tr. at 76.) Trooper Ophaven promptly initiated another traffic stop of Mr. Rodriguez and seized the phones. (Tr. at 77.) On November 26,

---

[2] Deputy Jensen testified that when Koa goes ahead of him to search smells on his own, he calls it "bracketing." (Tr. at 102.)

2024, the day after the stop, Investigator Rasinski applied for and obtained a warrant to search Mr. Rodriguez's phones for evidence of drug trafficking. (Gov. Ex. 19.)

## II.    Motion for Disclosure / Expansion of Jencks Act Obligation (Dkt. 89)

Mr. Rodriguez moves for a Court order compelling the Government to disclose Jencks Act materials two weeks before trial. (Dkt. 89.) The Government objects, arguing that it cannot be compelled to make pretrial disclosures of Jencks Act materials before a witness has testified at trial. (Dkt. 110 at 8.) Despite the objection, the Government agrees to disclose Jencks Act materials no later than one week before trial. (*Id.*)

While the Court is cognizant that disclosure of Jencks Act Materials after a witness has testified at trial creates the prospect of unnecessary delays in trial, Mr. Rodriguez has provided no citation to recent authority allowing a Court to require the Government to disclose Jencks Act materials before trial. Rather, "[t]he Jencks Act does not compel the government to produce a statement or report of a government witness until after the witness has testified on direct examination." *United States v. Green*, 151 F.3d 1111, 1115 (8th Cir. 1998); *see* 18 U.S.C. § 3500. Thus, the Court cannot require the Government to disclose Jencks Act materials before trial. *Id.* Accordingly, Mr. Rodriguez's Motion for Disclosure / Expansion of Jencks Act Obligation is denied.

## III.    Motion for Disclosure of Government's Intent to use Residual Hearsay Exception (Dkt. 90)

Mr. Rodriguez moves for an order requiring the Government to provide notice of its intent to use evidence covered by the residual hearsay exception thirty days before trial. (Dkt. 90.) The Government asserts it will comply with the notice requirements of Federal

Rule of Evidence 807 and agrees to disclose the anticipated evidence three weeks before trial. (Dkt. 110 at 9.)

Federal Rule of Evidence 807 provides that a "statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b).[3] "The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice." *Id.* Defendant's motion is granted in part to the extent that the Government shall fully comply with its obligations under Federal Rule of Evidence 807 and provide notice and the required disclosures no later than three weeks before trial begins.

## IV.    Motion for Disclosure of Records Relating to Canine (Dkt. 91)

Mr. Rodriguez moves for an Order requiring the Government to produce records relating to the training and certification of the canine involved in the traffic stop. (Dkt. 91.) The Government agreed to provide the canine's records. (Dkt. 110 at 9.) At the hearing, Mr. Rodriguez informed the Court that the Government had provided the canine's records and agreed the motion could be denied as moot. (Tr. at 10.) Accordingly, the Court denies Mr. Rodriguez's motion as moot.

---

[3] The Court notes that it appears Mr. Rodriguez is citing an old version of Federal Rule of Evidence 807 which had required disclosure of a declarant's address. (*See* Dkt. 90 at 1.) Disclosure of a declarant's address is no longer required by Federal Rule of Evidence 807. *See* Fed. R. Evid. 807 advisory committee's notes, 2019 Amendments ("[T]he prior requirement that the declarant's address must be disclosed has been deleted.")

**V.      Motion for Hearing Pursuant to *Franks v. Delaware* (Dkt. 94)**

Mr. Rodriguez requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). The grounds for Mr. Rodriguez's request were purportedly contained within his motions to suppress evidence which allege misleading statements and material omissions made in search warrant applications. (Dkt. 94.)

"Under *Franks,* a criminal defendant may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). The defendant bears the burden of demonstrating entitlement to a *Franks* hearing through a substantial preliminary showing "(1) that the affiant ... knowingly and intentionally made false statements or made them in reckless disregard for the truth and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *Id.* (internal quotations omitted). "The requirement of a substantial preliminary showing is not lightly met . . . ." *Id.* (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir.1998)). "It requires more than allegations, and a defendant satisfies this standard only by making an offer of proof, through affidavits, or other similarly reliable evidence." *United States v. Berry*, No. 24-cr-134 (PJS/TNL), 2024 WL 4895382, at *7 (citing *Franks*, 438 U.S. at 171) (D. Minn. Oct. 17, 2024), *R&R adopted*, No. 24-cr-0134 (PJS/TNL), 2024 WL 4894789 (D. Minn. Nov. 26, 2024). Thus, *Franks* hearings are granted by courts in only "very limited circumstances." *United States v. Ozar*, 50 F.3d 1440, 1445 (8th Cir. 1995).

The Court has reviewed the motions to suppress, and Mr. Rodriguez does not identify any misleading statements or material omissions. Nor did Mr. Rodriguez pursue this issue at the motion hearing or address it in his post-hearing briefing. Thus, Mr. Rodriguez has not made the substantial preliminary showing that would entitle him to a *Franks* hearing. Consequently, the Court denies his motion.

## VI.   Motion to Suppress Evidence Derived from Motor Vehicle Search (Dkt. 92)

Mr. Rodriguez contends that any evidence obtained from the search of his vehicle must be suppressed because (1) the initial stop of his vehicle was pretextual and unjustified, (2) the stop was unduly prolonged, and (3) Koa is an unreliable canine that did not clearly indicate the presence of controlled substances. (*See* Dkt 92 at 1; Dkt. 141 at 6.)

### A.   Initial Stop Was Supported by Probable Cause and Reasonable Suspicion

Mr. Rodriguez argues that Trooper Hanson did not have an objectively reasonable basis "to believe that he observed any traffic offense," because his primary goal was to find a reason to search the vehicle for evidence of drug trafficking. (Dkt. 141 at 10.)

A traffic stop constitutes a "seizure" under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Thus, a traffic stop "must be supported by reasonable suspicion or probable cause." *United States v. Hollins,* 685 F.3d 703, 706 (8th Cir. 2012) (quotation omitted). "Reasonable suspicion requires a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Shumaker*, 21 F.4th 1007, 1017 (8th Cir. 2021) (quotation omitted). "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the

stop, could have believed that there was a fair probability that a violation of law had occurred*." United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020) (cleaned up) (quoting *United States v. Andrews*, 454 F.3d 919, 921 (8th Cir. 2006)). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Adler,* 590 F.3d 581, 583 (8th Cir. 2009) (quoting *United States v. Wright,* 512 F.3d 466, 471 (8th Cir. 2008)). "This is true even if the officer would have ignored the violation but for a suspicion that greater crimes were afoot." *United States v. Randolph*, 628 F.3d 1022, 1025 (8th Cir. 2011) (citation and internal quotations omitted). Here, Trooper Hanson had two lawful bases to stop Mr. Rodriguez's vehicle: (1) probable cause for traffic violations, and (2) reasonable suspicion of drug trafficking.

First, Trooper Hanson observed Mr. Rodriguez cross the centerline in violation of Minn. Stat. § 169.18, subd. 7(1) (Tr. at 17-18; Gov. Ex. 9 at 0:53, 4:40-45.) In Minnesota, "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety." Minn. Stat. § 169.18, subd. 7(1). Mr. Rodriguez's contentions that the weather conditions justified his crossing of the centerline do not negate Trooper Hanson's probable cause to stop the Grand Am for a violation of Minn. Stat. § 169.18, subd. 7(1). To the contrary, under Minnesota law, even if Mr. Rodriguez "was driving properly for the conditions" it would "not negate the fact that [Trooper Hanson], a trained officer[], observed objective facts which made him suspect." *Shull v. Comm'r of Pub. Safety*, 398 N.W.2d 11, 14 (Minn. Ct. App. 1986); *see also State v. Linn*, No. C6-02-1176, 2002 WL 31890963, at *3 (Minn. Ct. App. Dec. 31, 2002) ("Minimal improper driving conduct is

11

still a basis for a stop. Poor road conditions and good faith do not negate that basis."). Trooper Hanson's observation of Mr. Rodriguez's vehicle crossing the centerline, alone, provided probable cause to conduct the traffic stop. *Adler*, 590 F.3d at 583; *Holly*, 983 F.3d at 364.

Second, Trooper Hanson observed that Mr. Rodriguez had an item affixed to his windshield in violation of Minn. Stat. § 169.71, subd. 1(a). Minnesota law prohibits having an item "suspended between the driver and windshield" of a vehicle subject to specific exceptions. Minn. Stat. § 169.71, subd. 1(a)(2). One exception is "global positioning systems or navigation systems when mounted or located near the bottommost portion of the windshield." Minn. Stat. § 169.71, subd. 1(a)(2)(iv). Trooper Hanson testified that he knew many people use their cell phones as a navigation system and that there is a statutory exemption for navigation systems but believed that Minnesota law required any navigation item or system to be at the lowest portion of the windshield to prevent obstruction of the driver's view. (Tr. at 38-39, 62.) Trooper Hanson testified that Mr. Rodriguez's cell phone holder was attached to the windshield just below the rear-view mirror so that the phone itself was positioned in the center of the windshield, not at the bottommost portion as required by law. (Tr. at 21.) And dash-camera video and body worn video confirm Trooper Hanson's description of the location of the item on the windshield. (Gov't Ex. 9 at 4:42; Gov't Ex. 10 at 1:44.)

Mr. Rodriguez correctly points out a lack of case law on traffic stops involving a navigation system placed in the center of a windshield, however, even if Trooper Hanson were mistaken as to the required location of the navigation device, that mistake was

objectively reasonable given the device was installed in a location that obstructed the driver's view. *United States v. Travis*, No. 14-cr-253 (DSD/SER), 2015 WL 439393, * 2 (D. Minn. Feb. 3, 2015) ("Moreover, even if Arbuckle was mistaken as to the exemptions, those mistakes are objectively reasonable.") (citation omitted); *United States v. Sanders,* 196 F.3d 910, 913 (8th Cir.1999) (discussing that officer's stop was reasonable, even if he were wrong, if he "objectively had a reasonable basis for believing that the driver has breached a traffic law") (quoting *United States v. Thomas,* 93 F.3d 479, 485 (8th Cir.1996)). Accordingly, the Court determines that Trooper Hanson had probable cause to initiate a traffic stop based on his reasonable belief that the phone holder's location in the center of the windshield violated Minnesota law. *Adler*, 590 F.3d at 583; *Holly*, 983 F.3d at 364. Because Trooper Hanson had probable cause to stop Mr. Rodriguez for two separate traffic violations, his subjective motivations that precipitated the stop are not relevant. *Randolph*, 628 F.3d at 1025.

Additionally, Investigator Rasinski had reasonable suspicion that Mr. Rodriguez was engaged in drug trafficking based on (1) Mr. Rodriguez's phone records confirming he communicated often with Mr. Diaz-Aguilar, (2) Mr. Rodriguez's prior criminal record involving methamphetamine distribution, (3) Mr. Rodriguez's Cash App transactions consistent with drug trafficking, and (4) the fact that Mr. Rodriguez met with Mr. Diaz-Aguilar three days before, and was traveling towards the people he had prior Cash App transactions with on the day of the stop.

Investigator Rasinski's reasonable suspicion was imputed to Trooper Hanson after he communicated details of his investigation to Agent Skoog who shared them with

Trooper Hanson. *See United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers."); *United States v. Banks*, 514 F.3d 769, 776 (8th Cir. 2008) ("When officers function as a search team, it is appropriate to judge probable cause upon the basis of their combined knowledge, because we presume that the officers have shared relevant knowledge which informs the decision to seize evidence or to detain a particular person.") (citation and internal quotations omitted); *United States v. Rederick*, 65 F.4th 961, 964, 966 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 241 (2023) (finding troopers had reasonable suspicion to stop vehicle where agent called troopers and explained the vehicle was involved in a drug trafficking investigation and asked them "to try to establish independent probable cause for the stop" ).

## B.  Stop Was Not Unreasonably Prolonged

In the challenge of the search of his vehicle, Mr. Rodriguez argues that Trooper Hansen and Deputy Jensen unreasonably prolonged the traffic stop, rendering it unconstitutional.

"[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350, (2015). "Whether the duration of the stop is reasonable is determined by the seizure's 'mission,' and law enforcement must be 'reasonably diligent' in carrying out that mission." *United States v. Rederick*, 65 F.4th at 966 (quoting  *United*

14

*States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021)). "[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates." *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993) (citation omitted). However, "[a]n officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Magallon*, 984 F.3d at 1278.

As discussed above, Trooper Hanson had probable cause to stop the vehicle based on traffic violations and reasonable suspicion to stop the vehicle for drug trafficking. But Trooper Hanson's suspicions of criminal activity also grew during the traffic stop. Trooper Hanson noticed that Mr. Rodriguez had two phones which he testified, in his training an experience, can be indicative of drug trafficking. (Tr. 65); *see also*, *e.g.*, *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) ("[D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection."); *United States v. Burris*, 22 F.4th 781, 785 (8th Cir. 2022) ("[T]raffickers often use multiple phones to avoid detection and to compartmentalize different points of contact in the drug dealing business"). Trooper Hanson also observed that Mr. Rodriguez's eyes were bloodshot and watery, and that combined with crossing the centerline, made him believe that Mr. Rodriguez might be driving under the influence of something. *Magallon*, 984 F.3d at 1278.[4] Thus, Trooper Hanson's "mission" for the stop was not merely to

---

[4] To the extent that Mr. Rodriguez argues there were innocent explanations for his blood shot and watery eyes to undermine the validity of Trooper Hanson's decision to conduct field sobriety tests that argument is unpersuasive. (Dkt. 141 at 12 n.9.); *see United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) ("When considered together, however, otherwise innocent facts can give rise to a reasonable suspicion, especially when viewed through the perspective of an experienced law enforcement officer.").

investigate the traffic violations as Mr. Rodriguez suggests. *Rederick*, 65 F.4th at 966. Rather, Trooper Hanson's mission also encompassed investigating suspected driving while under the influence and drug trafficking. Thus, the relevant question is whether Trooper Hanson and Deputy Jensen detained Mr. Rodriguez longer than necessary to carry out these three "missions." The Court determines that they did not.

The entire stop of Mr. Rodriguez lasted approximately thirty-seven minutes. (Gov. Ex. 9 at 6:50-44:09.) During the stop, Trooper Hanson conducted ordinary traffic violation inquiries by asking for Mr. Rodriguez's license, proof of insurance, and returning to his vehicle to inspect the documents and check for outstanding warrants. *Rodriguez*, 575 U.S. at 355. Trooper Hanson also investigated whether Mr. Rodriguez was driving under the influence by having him complete field sobriety testing. Then, Deputy Jensen investigated suspected drug trafficking by asking Mr. Rodriguez if the vehicle contained narcotics, asking for consent to search, and having canine Koa conduct a dog sniff. *See Rederick*, 65 F.4th at 967 (finding drug-dog sniff was part of mission of stop where troopers had reasonable suspicion of drug activity before initiating the stop). All three investigations were part of the "missions" of the stop. The Court concludes that thirty-seven minutes was a reasonable duration for the three investigations. *See Rederick*, 65 F.4th at 966 (upholding a 27-minute stop to investigate drugs); *United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (affirming a 23-minute stop to investigate a traffic violation and a drug transaction); *see also Magallon*, 984 F.3d at 1279 (finding hour long delay to investigate drug trafficking was not unreasonable explaining that "addressing the suspicion of drug activity require[s] time").

16

Thus, the Court determines that the length of the stop was justified, and the evidence derived from the search should not be suppressed.

### C.  Law Enforcement had Probable Cause to Search Grand Am

In his challenge to the search of his vehicle, Mr. Rodriguez also argues that canine Koa did not provide a reliable basis to search Mr. Rodriguez's Grand Am and that any evidence seized must be suppressed.

"An alert or indication by a properly trained and reliable drug dog provides probable cause…for the search of a vehicle." *Rederick*, 65 F.4th at 967 (quoting *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010)). "A drug detection dog is considered reliable when it has been trained and certified to detect drugs." *Winters*, 600 F.3d at 967 (quotation omitted); *accord Rederick*, 65 F.4th at 967. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).  "The sufficiency of a drug dog's alert must be construed with the same "flexible, common-sense standard" as probable cause." *Rederick*, 65 F.4th at 968 (quoting *Harris*, 568 U.S. at 240). Moreover, "[e]ven if a drug dog's 'performance record raises questions about his reliability…the issue is whether 'the totality of the circumstances present at the scene' provided probable cause to search." *Winters*, 600 F.3d at 968 (quoting *Donnelly*, 475 F.3d 955).

Here, it is undisputed that canine Koa was certified by the North American Work Dog Association for the detection of narcotics. (Gov. Ex. 11; Tr. at 90.) Thus, the Court can presume Koa's alert provided probable cause subject to any conflicting evidence

17

presented. *Harris*, 568 U.S. at 246-47. Mr. Rodriguez argues that Koa did not provide probable cause to search because (1) Koa had completed training only two weeks before the stop, (2) Koa deviated from training during the stop and his final indication was "ambiguous," and (3) Koa had a record of unreliability. (Dkt. 141 at 13-17.) These arguments are unpersuasive.

First, Koa's lack of field experience as a new drug canine does not alone suggest unreliability. *See States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) (finding dog's alert provided probable cause to search even though it was the dog's first field operation). Second, one of Koa's alleged deviations—jumping onto his hind legs to sniff the open window of the car was, as Deputy Jensen testified, a significant alert because he had never seen Koa leave his feet in training unless he was investigating a narcotics odor. (Tr. 102.) Deputy Jensen also testified that the excess narcotics odor may have made it difficult for a dog to pinpoint the narcotics exact location. (Tr. at 103.) And the second deviation, Koa jumping onto Deputy Jensen, occurred only after Koa had already given a final indication (Tr. at 105.).

It was also unnecessary for canine Koa to give only a "trained response to the odor of narcotics rather than an untrained one." *United States v. Thin Elk*, 148 F.4th 595, 600 (8th Cir. 2025) (citation omitted). A drug dog's alert is sufficient for probable cause, even without a final indication. *See United States v. Holleman*, 743 F.3d 1152, 1157 (8th Cir. 2014) ("[T]he handling officer testified Henri gave two definitive "alerts" to the side of Holleman's truck. As a result, we are not concerned about Henri's failure to give a full indication . . . ."); *Rederick*, 65 F.4th at 968 (finding drug dog's changed breathing and

wagging tail faster sufficient alert behavior provided probable cause to search). Deputy Jensen testified that he identified Koa's alert to the presence of narcotics when Koa stopped following his hand to sniff odors, snapped his head to rear wheel well, engaged in bracketing, and jumped up to sniff inside an open window. He also testified that Koa gave two final indications when he laid down briefly, twice, and that Koa was not required to remain down for any amount of time. (Tr. at 103.) The Court finds the training records, certification, Deputy Jensen's testimony, and the other evidence in the record supports a finding that Koa's alerts and indications during the stop provided probable cause to search.

Third, though Mr. Rodriguez points to two instances before the stop where Koa falsely alerted, the deployment record for the false alert on November 23, 2024 is not in evidence. And although the evidence submitted shows that Koa falsely alerted on November 16, 2024 (Gov. Ex. 13) the evidence also shows he performed accurately on November 17, 2024 (Gov. Ex. 12) and on the morning of November 24, 2024. Overall, the Court cannot discern Koa's overall accuracy rate because the record lacks specificity on Koa's performances preceding the stop, such as under what circumstances false alerts occurred, or how often. *See United States v. Anderson*, No. 24-CR-263 (DSD/DJF), 2025 WL 2697861 (D. Minn. Aug. 28, 2025) (rejecting defendant's argument that drug dog's records demonstrated misinterpreted or false alerts where records were not submitted into evidence and the court could not discern "whether these were limited instances or regular occurrences"), *R&R adopted*, 2025 WL 2697422 (D. Minn. Sept. 22, 2025). Without specific evidence of Koa's overall accuracy before the stop, the Court finds Deputy Jensen's testimony, canine Koa's records and certification, and the video showing Koa's

behavior, all support a finding that Deputy Jensen credibly identified Koa's alerts and indications during the stop, providing probable cause to search.

Finally, even if Mr. Rodriguez definitively demonstrated that Koa was a low-accuracy dog, the totality of the circumstances present at the scene, combined with the collective knowledge of Investigator Rasinski, still provided probable cause to search the Grand Am. *Winters*, 600 F.3d at 968.[5]  At the time of the traffic stop law enforcement knew Mr. Rodriguez was in communication with Mr. Diaz-Aguilar (a person involved with drug distribution) based on the seizure of Mr. Diaz-Aguilar's phones. Law enforcement was aware of Mr. Rodriguez's past criminal history involving drug distribution. Law enforcement suspected that Mr. Rodriguez's Cash App activity was consistent with drug sales, and that Mr. Rodriguez had traveled to the locations where the individuals who had paid Mr. Rodriguez through Cash App lived. And law enforcement knew that Mr. Rodriguez met with Mr. Diaz-Aguilar a few days before the stop, and that Mr. Rodriguez was traveling towards the people he had prior Cash App transactions with when he was stopped with two cell phones in his possession. These facts imputed to Trooper Hanson, and combined with canine Koa's alert, established probable cause to search the Grand Am. *Rederick*, 65 F.4th at 966; *Winters*, 600 F.3d at 968.

For the foregoing reasons, the Court concludes that law enforcement had both reasonable suspicion and probable cause to stop the Grand Am, and probable cause to

---

[5] To the extent that Rodriguez relies on Koa's performance months after the stop at issue, that reliance is misplaced because the "issue is whether the totality of the circumstances *present* at the scene provided probable cause to search." *Winters*, 600 F.3d at 968 (emphasis added) (cleaned up). Nor has Rodriguez provided any legal authority for

search. Therefore, the Court recommends denying the Motion to suppress evidence obtained from the Grand Am.

## VII. Motion to Suppress Evidence Derived from Search of Cell Phones (Dkt. 93)

Mr. Rodriguez argues there was no independent reason[6] for the second stop of his vehicle and the seizure of his two phones was unlawful. The Government argues that law enforcement had reasonable suspicion to stop the vehicle a second time, had probable cause to the seize the phones, and exigent circumstances supported the warrantless seizure of the phones.

Here, the Court concludes there was probable cause to believe the Grand Am, and specifically the phones, contained evidence of drug trafficking, justifying the second stop of Mr. Rodriguez. *Hollins*, 685 F.3d at 706. The second stop was not based on a hunch, rather it was based on the same factors which formed probable cause to search the Grand Am during the first stop discussed above. Additionally, law enforcement's seizure of approximately three pounds of methamphetamine during the first stop further provided probable cause that the vehicle and the phones contained evidence of drug trafficking. *See United States v. Barrios*, No. 24-10116 (JWB), 2025 WL 1517422, at * 9 (D. Kan. May 28, 2025) (finding second stop occurring minutes after first stop was justified where facts known before first stop and discovered before second stop amounted to reasonable suspicion and probable cause of drug smuggling).

---

[6] Defendant does not provide specific argument on the unlawfulness of the second stop, only that there was "no independent reason for stopping Rodriguez's vehicle. (Dkt. 141 at 18.)

Mr. Rodriguez argues that the warrantless seizure of the phones during the second stop was unlawful. The Court disagrees. "The warrantless seizure of property is per se unreasonable unless it falls within a well-defined exception to the warrant requirement." *United States v. Mays*, 993 F.3d 607, 614 (8th Cir. 2021) (quotation omitted). "One such exception applies when officers have probable cause to seize the property and exigent circumstances require immediate seizure." *United States v. Shrum*, 59 F.4th 968, 972 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 300 (2023). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "[E]xigent circumstances exist when, if the property is not seized immediately, there is a risk that the evidence contained therein would be lost or destroyed." *Mays*, 993 F.3d at 616 (citations omitted). "The existence of exigent circumstances is an objective analysis focusing on what a reasonable, experienced police officer would believe." *United States v. Williams*, 431 F.3d 1115, 1118 (8th Cir. 2005) (quotation omitted).[7]

Here, law enforcement had probable cause to seize the phones. *See Hernandez-Mendoza*, 600 F.3d at 977; *Burris*, 22 F.4th at 785. Because Mr. Rodriguez communicated with Mr. Diaz-Aguilar on the phone, he had received money through Cash App, an

---

[7] Mr. Rodriguez argues that because law enforcement did not testify that they subjectively believed Mr. Rodriguez would destroy the phones, there were not exigent circumstances warranting seizure of the phones. (Dkt. 141 at 18.) Mr. Rodriguez has provided no legal support for this contention and in any event, whether exigent circumstances existed is an "objective analysis." *Williams*, 431 F.3d at 1118.

application installed on the phone, and law enforcement had just seized three pounds of methamphetamine from his Grand Am, a reasonable officer would believe  that Mr. Rodriguez would immediately delete all incriminating information on the phones such as text messages, photographs, audio files, and applications. *See United States v. Mayer*, No. 19-cr-0096 (WMW/HB), 2019 WL 8370776 (D. Minn. Dec. 10, 2019) (finding exigent circumstances justified warrantless seizure of phone where defendant may destroy evidence because he was not allowed to have internet capable phone and leaned away from officers while manipulating phone ), *R&R adopted*,  2020 WL 583008 (D. Minn. Feb. 6, 2020); *Shrum*, 59 F.4th at 972-73 (finding exigent circumstances justified warrantless seizure of phone where reasonable officer could believe defendant would destroy evidence after being informed of the accusation for which evidence existed on phone); *United States v. Evans*, No. 1:23-cr-00117 (AGF), 2024 WL 5232987, at * 4 (E.D. Mo. Dec. 27, 2024) (finding exigent circumstances where reasonable officer could believe evidence might be deleted from phone after defendant was aware he was accused of an offense involving recording on phone); *United States v. Wright*, No. 23-cr-160 (NEB/JFD), 2025 WL 602465 (D. Minn. Feb. 25, 2025) (finding exigent circumstances justified warrantless seizure of two phones where reasonable officer would worry that defendant would delete incriminating information if not seized after drug dog alerted to narcotics); *Mays*, 993 F.3d at 614-16 (finding exigent circumstances justified warrantless seizure of laptop where  the laptop likely was used to further the defendant's scheme, evidence of that scheme may be on the laptop, and investigators risked losing digital evidence on the laptop without immediate seizure).

In sum, the Court concludes that officers had probable cause to believe evidence of drug trafficking would be contained on the phones and it was reasonable for officers to seize the phones without a warrant in order to prevent the imminent destruction of evidence. Therefore, the Court recommends denying Mr. Rodriguez's motion to suppress evidence derived from the search of the cellphones. (Dkt. 93.)

## VIII.  Conclusion

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY ORDERED** that:

1. Defendant**'s** Motion for Disclosure / Expansion of Jencks Act Disclosure Obligation (Dkt. 89) is **DENIED**.

2. Defendant's Motion for Disclosure of Government's Intent to use Residual Hearsay Exception (Dkt. 90) is **GRANTED-IN-PART**.

3. Defendant's Motion for Disclosure of Records Relating to Canine (Dkt. 91) is **DENIED** as moot.

4. Defendant's Motion for Hearing Pursuant to *Franks v. Delaware* (Dkt. 94) is **DENIED.**

Furthermore, based on the file, record, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Derived from Motor Vehicle Search (Dkt. 92) be **DENIED**.

24

2.     Defendant's Motion to Suppress Evidence Derived from Search of Cell Phones

(Dkt. 93) be **DENIED**.


Dated: December 11, 2025          *s/Shannon G. Elkins*
                                  SHANNON G. ELKINS
                                  United States Magistrate Judge




**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).