## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Eric Anthony Rodriguez,<br><br>Defendant. | Case No. 25-cr-00091(05)(SRN/SGE)<br><br><br>**ORDER ON DEFENDANT'S OBJECTION TO REPORT AND RECOMMENDATION** |

Raphael Coburn, United States Attorney's Office, 300 S. 4th St., Ste. 600, Minneapolis, MN 55415, for United States of America

Glenn P. Bruder, Mitchell, Bruder & Johnson, 9531W. 78 St., Ste. 310, Eden Prairie, MN 55344, for Defendant Eric Anthony Rodriguez

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Eric Anthony Rodriguez's Objection [Doc. No. 165] to Magistrate Judge Shannon G. Elkins' December 11, 2025 Report and Recommendation ("R&R") [Doc. No. 160]. In the R&R, Magistrate Judge Elkins recommended the denial of Mr. Rodriguez's Motion to Suppress Evidence Derived from Motor Vehicle Search [Doc. No. 92] and Motion to Suppress Evidence Derived from Search of Cell Phones [Doc. No. 93]. For the reasons set forth below, the Court overrules Mr. Rodriguez's Objection, adopts Magistrate Judge Elkins' R&R, and denies Mr. Rodriguez's motions.

## I.     BACKGROUND

Mr. Rodriguez is charged with one count of participating in a drug conspiracy that operated from approximately May 2024 through March 2025, and one count of possession with intent to distribute methamphetamine.  (Superseding Indictment [Doc. No. 103], Counts 1, 7.)  The Superseding Indictment charged four other defendants, and the joint trial for Mr. Rodriguez and Co-Defendant Erick Emilio Diaz-Aguilar is scheduled to begin on February 3, 2026.

In his suppression motions, Mr. Rodriguez moves to suppress evidence seized during a vehicle stop on November 25, 2024 that led to the seizure of three pounds of methamphetamine, and a second stop later that day that led to the seizure of Mr. Rodriguez's two cell phones.  On August 20 and September 4, 2025, Magistrate Judge Elkins conducted an evidentiary hearing on these motions.

### A. Factual Background

In August or September 2024, Olmstead County Sheriff's Office Investigator Brendan Rasinski was investigating a drug trafficking organization.  (R&R. at 2.)  As part of the investigation, officers seized and searched cell phones from Erick Emilio Diaz-Aguilar.  (*Id.*)  After discovering frequent communications between Mr. Diaz-Aguilar and Mr. Rodriguez, investigators reviewed Mr. Rodriguez's criminal record, finding that he was on supervised release for a drug offense and had been previously convicted of a drug distribution offense.  (*Id.*)  From publicly available profile information, Investigator Rasinski also found that Mr. Rodriguez had a Cash App account.  (*Id.*)  Investigator Rasinski subpoenaed Mr. Rodriguez's Cash App account records, which revealed multiple

transactions with persons in the areas of Bemidji and Moorhead, Minnesota. (*Id.*) Based on the Cash App transactions, Investigator Rasinski suspected that Mr. Rodriguez was distributing controlled substances in those two areas. (*Id.*) Investigator Rasinski then obtained a warrant for Mr. Rodriguez's historical cell phone location data. (*Id.* & Gov't Ex. 17.) The location data confirmed that Mr. Rodriguez had taken short trips to Bemidji and Moorhead, consistent with the Cash App transactions. (R&R at 3.) After determining that Mr. Rodriguez had a registered vehicle, a gold Pontiac Grand Am, Investigator Rasinski applied for and obtained a tracking warrant for the car. (*Id.*)

On November 22, 2024, the vehicle tracker indicated that Mr. Rodriguez met with Mr. Diaz-Aguilar. (*Id.*) Three days later, on November 25, 2024, the tracker indicated that the Grand Am was heading north, in the direction of Bemidji and/or Moorhead. (*Id.*) Based on his belief that Mr. Rodriguez was transporting bulk amounts of methamphetamine, Investigator Rasinski contacted Minnesota Bureau of Criminal Apprehension ("BCA") agents, including Agent Dan Skoog. (*Id.*) Investigator Rasinski discussed the investigation with Agent Skoog and asked that the Grand Am be stopped and that law enforcement officers seize any controlled substances. (*Id.*)

Agent Skoog contacted Otter Tail County Deputy and K9 Officer Kelby Jensen, and Minnesota Highway Patrol Trooper Kyle Hanson, requesting a stop of the Grand Am. (*Id.* at 3–4.) Agent Skoog communicated to Trooper Hanson the information from Investigator Rasinski about the drug distribution investigation and his belief that the Grand Am contained methamphetamine. (*Id.* at 4.)

After spotting the Grand Am on Interstate 94 near exit 54, Trooper Hanson followed

it and observed it crossing over the center line of the highway and weaving within its lane. (*Id.*) While driving alongside the Grand Am, Trooper Hanson further observed a phone holder mounted to the windshield below the rearview mirror. (*Id.*) Trooper Hanson found Mr. Rodriguez's driving and the placement of the phone holder to be legal infractions, and he pulled over Mr. Rodriguez. (*Id.*)

While Mr. Rodriguez looked for his identification and proof of insurance, Trooper Hanson observed two phones in the vehicle. (*Id.*) In addition, he noticed that Mr. Rodriguez had bloodshot and watery eyes, which he believed were potential signs of intoxication. (*Id.*) While Trooper Hanson checked Mr. Rodriguez's insurance and records, Deputy Jensen arrived. (*Id.*) Trooper Hanson requested that Mr. Rodriguez perform a field sobriety test, a process that lasted approximately ten minutes. (*Id.* at 5.) While he observed some signs of impairment in Mr. Rodriguez, he did not believe he had probable cause to arrest him for driving under the influence. (*Id.*)

Trooper Hanson and Deputy Jensen conferred about Mr. Rodriguez's field sobriety performance, and Deputy Jensen then approached Mr. Rodriguez, seeking consent to search the vehicle. (*Id.*) After Mr. Rodriguez denied consent, Deputy Jensen spoke with Investigator Rasinski by phone to discuss next steps. (*Id.*) Investigator Rasinski communicated that Mr. Rodriguez was a target of a narcotics investigation in which he was suspected of trafficking large amounts of controlled substances from the Twin Cities to the Moorhead area. (*Id.*)

Based on this information, Deputy Jensen decided to conduct a dog sniff around the Grand Am with Koa. (*Id.*) Deputy Jensen and Koa were certified in narcotics detection

with the U.S. Police Canine Association ("USPCA") on September 30, 2024, following a 13-week course.  (Supp. Hr'g Tr., Vol. II [Doc. No. 136] at 84.)  USPCA certification lasts for one year, meaning that Koa's certification would expire in September 2025.  (*Id*. at 85.) At the suppression hearing, Deputy Jensen testified that on one occasion in February 2025, a few months after the stop in question, he performed remedial training with Koa after she exhibited "falsing" behavior, i.e., laying down when there was no odor present  (*Id.* at 88.) He testified that Koa was not presenting this behavior in October or November of 2024, at which time he had no concerns about Koa's reliability as a narcotics detection canine.  (*Id.* at 89.)  After the remedial training in February 2025, Deputy Jenson and Koa were recertified.  (*Id.*)

During Koa's minute-long sniff on November 25, he alerted to the presence of narcotics by investigating odors on his own initiative, snapping his head toward the rear wheel well, and standing on his hind legs to sniff the open window.  (R&R at 6.)  In addition, Koa gave two final indications for the presence of narcotics by placing his stomach close to the ground.  (*Id.*)  At the time of the stop, the temperature was approximately 15 degrees, with wind blowing from the driver's front wheel to the rear of the vehicle.  (Supp. Hr'g Tr., Vol. II at 106.)  While Deputy Jensen acknowledged that wind could make it more difficult for a trained canine to detect narcotic odor, the windows of the Grand Am were open at the time of the dog sniff.  (*Id.*)  Deputy Jensen testified that "especially on older vehicles and with the windows down and with the vehicle running and with heat on, there's just—whatever odor is inside the vehicle is coming out through every opening available."  (*Id.*)  Based on Koa's alerts, Deputy Jensen determined that there was

probable cause to search the vehicle for narcotics. (R&R at 6.)  He located and seized approximately three pounds of suspected methamphetamine from the vehicle's trunk.  (*Id.*)

After seizing the methamphetamine, Trooper Hanson issued Mr. Rodriguez a warning for traffic violations and allowed him to leave the scene.  (*Id.*)  Shortly thereafter, when Investigator Rasinski learned that the officers had seized narcotics, but not cell phones, he requested a second stop based on his belief that the cell phones would contain evidence of drug trafficking.  (*Id.*)

Trooper Hanson contacted Minnesota State Trooper John Ophoven, explaining the need to seize the two cell phones.  (*Id.*)  Trooper Ophoven initiated the second stop of Mr. Rodriguez's vehicle and seized the two phones.  (*Id.*)   The following day, Investigator Rasinski applied for and obtained a warrant to search Mr. Rodriguez's phones for evidence of drug trafficking.  (*Id.*)

### B. Pending Motions, R&R, and Defendant's Objection

As noted, Mr. Rodriguez moves to suppress evidence derived from the initial motor vehicle search.   Magistrate Judge Elkins found that probable cause and reasonable suspicion supported the initial stop; the stop was not unreasonably prolonged; and law enforcement had probable cause to search the Grand Am.  (R&R at 10–21.)  As to Mr. Rodriguez's motion to suppress evidence derived from the search of the cell phones, the magistrate judge also found that law enforcement officers had probable cause to seize the phones.  (*Id.* at 21–24.)

Mr. Rodriguez's Objection is focused on the magistrate judge's findings and recommendations concerning the validity of the initial stop.  (Def.'s Obj. at 6–9.)  As to

evidence obtained from the search of the two cell phones, the Court agrees with and adopts the magistrate judge's analysis and recommendation to deny Mr. Rodriguez's suppression motion. (*See* R&R at 21–24.) To the extent Mr. Rodriguez bases his argument for suppression of the cell phone evidence on the fruit of the poisonous tree doctrine, any such argument fails as the Court finds the initial stop and search were lawful, as discussed *infra*. Therefore, the Court denies Mr. Rodriguez's Motion to Suppress Evidence Derived from Search of Cell Phones.

## II. DISCUSSION

### A. Standard of Review

The district court reviews a magistrate judge's recommendations on dispositive matters de novo, undertaking an independent analysis of those portions of the R&R to which a party objects. 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. L.R. 72.2(b)(3).

### B. Motion to Suppress Evidence Derived from Motor Vehicle Search

#### 1. Initial Stop of Motor Vehicle

In his Objection, Mr. Rodriguez argues that the two traffic/vehicle infractions were merely pretextual and not a lawful basis for the initial stop of his vehicle. As to Trooper Hanson's observation that Rodriguez drove over the center lane and back, he contends that the magistrate judge "made no meaningful effort to scrutinize the validity of the police officer's observations prior to the stop of Rodriguez's vehicle." (Def.'s Obj. at 6.) Specifically, Mr. Rodriguez argues that the magistrate judge ignored the weather and road conditions at the time and failed to identify Minnesota legal authority for the stop. (*Id.*) Similarly, as to the infraction for having a device on his windshield, Mr. Rodriguez contends

that the magistrate judge ignored the statutory exception for global positioning devices. (*Id.*) Further, Mr. Rodriguez argues that Investigator Rasinski's suspicions about Mr. Rodriguez's involvement in narcotics distribution were not sufficient alone to justify the stop of the vehicle. (*Id.* at 7.)

A traffic stop or investigatory detention constitutes a seizure within the meaning of the Fourth Amendment. *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir.2004) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). An investigatory detention, which is a brief seizure by police based on a reasonable suspicion of criminal activity, is a narrow exception to the Fourth Amendment's probable cause requirement. *Terry v. Ohio*, 392 U.S. 1, 26–27 (1968); *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009). The officer must have a reasonable, articulable suspicion of criminal activity in order to conduct the investigatory detention, known as a *Terry* stop. *Id*. at 21–22. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. *Id.* at 21.

Any traffic violation provides probable cause to stop a vehicle. *United States v. Ramos-Caraballo*, 375 F.3d 797, 801 (8th Cir. 2004). "This is true even if the officer would have ignored the violation but for a suspicion that greater crimes were afoot." *United States v. Randolph*, 628 F.3d 1022, 1025 (8th Cir. 2011) (citation and internal quotations omitted). The determination of whether probable cause for the stop existed is not made in hindsight, but is based on what an officer reasonably believed at the time. *See United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999). If an officer can point to "specific and articulable facts" and rational inferences drawn from those facts to support reasonable suspicion, a *Terry* stop

is valid. *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (citing *Terry*, 392 U.S. at 21). A court considers the totality of the circumstances to determine whether a *Terry* stop was justified. *Id.*

In *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017), *cert. denied*, 584 U.S. 954 (2018), the Eighth Circuit found no Fourth Amendment violation where a state trooper pulled over the defendant's car because of overly tinted windows as well as information from a confidential informant that the vehicle contained cocaine. The Eighth Circuit found that even though the trooper cited tinted windows as the basis for the stop, "the probable cause that already existed from the CI's information was enough in this case." *Id.* at 628–29. The Eighth Circuit explained,

> The error in Rowe's argument is his focus on the fact that [the trooper] effectuated an investigatory stop based only on the excessive window tint. The stop was not unconstitutionally expanded given that the entire basis for the stop was the drug interdiction, despite the trooper's alternate reasoning offered.

*Id.* at 629.

The totality of the circumstances here shows that the stop of the Grand Am was supported by reasonable, articulable suspicion and probable cause. First, officers had collective knowledge to suspect that Mr. Rodriguez was involved in drug trafficking. Although their collective knowledge did not involve information from a confidential informant as in *Rowe*, the officers' reasonable suspicion of drug trafficking was based on

> (1) Mr. Rodriguez's phone records confirming he communicated often with Mr. Diaz-Aguilar, (2) Mr. Rodriguez's prior criminal record involving methamphetamine distribution, (3) Mr. Rodriguez's Cash App transactions consistent with drug trafficking, and (4) the fact that Mr. Rodriguez met with Mr. Diaz-Aguilar three days before [the stop], and was traveling towards the people he had prior Cash App transactions with on the day of

9

the stop.

(R&R at 13.)  Investigator Rasinski's reasonable suspicion was imputed to Trooper Hanson after Rasinski communicated the details of the investigation to Agent Skoog, who, in turn, shared the details with Trooper Hanson.  *See United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) ("The collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the stop when there is communication between the officers.").

Mr. Rodriguez argues that merely being seen with or associating with a suspected criminal does not subject a person to a lawful stop and warrantless search.  (Def.'s Obj. at 7.) However, even if the officers' reasonable, articulable suspicion of Mr. Rodriguez's criminal activity were insufficient alone, his driving/vehicle infractions provided lawful bases for the investigatory stop.  Mr. Rodriguez contends that Magistrate Judge Elkins "ignored weather conditions" in evaluating the reasonableness of Trooper Hanson's observation that the Grand Am crossed the center line of the highway.  (*Id.* at 6.)  But the magistrate judge clearly addressed weather conditions, finding they did not negate Trooper Hanson's probable cause to stop Mr. Rodriguez's vehicle for a violation of Minn. Stat. § 169.18, subd. 7(1), which requires a vehicle to be driven as nearly as practicable within a single lane.  (R&R at 11) (citing *Shull v. Comm'r of Pub. Safety*, 398 N.W.2d 11, 14 (Minn. Ct. App. 1986) (noting that even if the defendant was driving properly for the conditions, it would not negate that a trained officer observed objective facts that made him suspect a driving violation); *State v. Linn*, No. C6-02-1176, 2002 WL 31890963, at *3 (Minn. Ct. App. Dec. 31, 2002) ("Minimal improper

10

driving conduct is still a basis for a stop.  Poor road conditions and good faith do not negate that basis.")).  Therefore, regardless of road conditions, Trooper Hanson's observation of Mr. Rodriguez's vehicle crossing the center line provided probable cause to conduct the traffic stop, independent of officers' reasonable suspicion of Defendant's involvement in drug trafficking.  *United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020); *United States v. Adler*, 590 F.3d 581, 583 (8th Cir. 2009).

As to the placement of Mr. Rodriguez's cell phone mounting device, while Minnesota law generally prohibits having an item "suspended between the driver and windshield" of a vehicle, Minn. Stat. § 169.71, subd. 1(a)(2), there is an exception for "global positioning systems or navigation systems when mounted or located near the bottommost portion of the windshield."  *Id.*, subd. 1(a)(2)(iv).  Trooper Hanson was aware of this exception and testified that Mr. Rodriguez's cell phone mounting device was attached just below the rearview mirror and not on the bottommost portion of the windshield, as required by law.  (Supp. Hr'g Tr., Vol. I [Doc. No. 135] at 18, 21, 38–39, 62.)  Magistrate Judge Elkins noted that dashboard camera and body worn video confirmed Trooper Hanson's description of the location of the item on the windshield.  (R&R at 12) (citing Gov't Ex. 9 at 4:42; Gov't Ex. 10 at 1:44).

The magistrate judge acknowledged there is a lack of legal authority on traffic stops involving a navigation system or cell phone holder placed in the center of the windshield, (*id.*), but she correctly found that even if Trooper Hanson were mistaken about the required location of the device, his mistake was objectively reasonable given the statutory language and the device's location.  (*Id.*); *Sanders*, 196 F.3d at 913 ("Regardless of whether or not the trailer actually was in violation of the South Dakota statute, Officer Jorgenson was justified

11

in making the stop if he objectively had a reasonable basis for believing that the driver has breached a traffic law."). Therefore, Mr. Rodriguez's vehicle infraction provided an additional lawful basis for the stop.

For all of these reasons, the Court overrules Mr. Rodriguez's Objection as it relates to the existence of probable cause and reasonable suspicion for the initial stop.

### 2. Length of Initial Stop

Next, Rodriguez argues that even if the stop was supported by probable cause, the Court should nevertheless reject the magistrate judge's finding that the length of Rodriguez's seizure was constitutionally permissible. (Obj. at 8.) He argues that the magistrate judge "blithely accepted Trooper Hanson's testimony at face value without affording any meaningful scrutiny to the officer's questionable motivations or repeated communications with third parties involved in the drug investigation for guidance." (*Id.*)

While an investigative stop "must cease once reasonable suspicion or probable cause dissipates," *United States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993), "[a]n officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021). Whether the length of a police stop is reasonable depends on the seizure's "mission," and whether officers were reasonably diligent in carrying out that mission. *Rodriguez v. United States*, 575 U.S. 348, 350–51 (2015). In *Rodriguez*, the Supreme Court noted that where a police-observed traffic violation forms the *only* basis for the seizure, the seizure "becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation." *Id*. (citation omitted).

As Magistrate Judge Elkins noted, Trooper Hanson had probable cause to stop the vehicle based on traffic violations and reasonable suspicion to stop the vehicle for drug trafficking. (R&R at 15.)  Moreover, Trooper Hanson's suspicions of criminal activity grew during the stop.  (*Id.*)  He noticed that Mr. Rodriguez had two cell phones, which, in the officer's training and experience, can be indicative of drug trafficking.  (*Id.*) (citing Supp. Hr'g Tr., Vol. I at 65); *see also United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010) (D]rug traffickers typically carry multiple cell phones to allow for the disposal of one or more, if necessary to avoid detection.").    Trooper Hanson also observed Mr. Rodriguez's watery and bloodshot eyes which, combined with observing his vehicle cross the center line, led the officer to believe that Mr. Rodriguez might be driving under the influence. (R&R at 15 & n.4.)  Even if there was an innocent explanation for the condition of Mr. Rodriguez's eyes, when considered with other facts, "otherwise innocent facts can give rise to a reasonable suspicion, especially when viewed through the perspective of an experienced law enforcement officer."  *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007).

As the magistrate judge properly found, Trooper Hanson's "mission" for the stop involved three investigatory purposes—suspected drug trafficking, traffic/vehicle violations, and driving under the influence.  (R&R at 16.)  During the stop, he conducted ordinary traffic violation inquiries and returned to his car to inspect documents and check for outstanding warrants.  (*Id.*)  He also conducted a field sobriety test to determine if Mr. Rodriguez was driving under the influence.  (*Id.*)   In addition, to investigate suspected drug trafficking, he asked for consent to search the vehicle and when consent was denied, Deputy Jensen and Koa conducted a dog sniff.  All three investigations were part of the "mission" for the 37-minute

13

stop.  The Court agrees with the magistrate judge that under the totality of circumstances here, a 37-minute stop was a reasonable duration to complete the mission.  *United States v. Rederick*, 65 F.4th 961, 966 (8th Cir. 2023) (upholding 27-minute stop to investigate drugs); *United States v. Murillo-Salgado*, 854 F.3d 407, 416 (8th Cir. 2017) (affirming 23-minute stop to investigate traffic violation and drug transaction); *Magallon*, 984 F.3d at 1279 (finding hour-long delay to investigate drug trafficking was not unreasonable as "addressing the suspicion of drug activity require[s] time.").

For all of these reasons, the  Court finds the traffic stop was reasonable in length and overrules Mr. Rodriguez's Objection to the R&R in this regard.

### 3.  Probable Cause to Search Motor Vehicle

Finally, Mr. Rodriguez argues that the magistrate judge also "unreasonably excused K9 Koa's repeated departures from its training, questionable signaling and checkered history both before and after this stop."  (Def.'s Obj. at 8.)

An officer may expand the scope of a *Terry* stop if the officer has reasonable, articulable suspicion that the person is engaged in criminal activity.  *United States v. Binion*, 570 F.3d 1034, 1039 (8th Cir. 2009); *United States v. Gil*, 513 F.3d 836, 844 (8th Cir. 2008); *United States v. Long*, 320 F.3d 795, 800 (8th Cir.2003).  To expand the scope of the stop, "[t]he officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Binion*, 570 F.3d at 1039 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances.  *Gil*, 513 F.3d at 844; *Binion*, 570 F.3d at 1039; *United States v. Linkous*, 285 F.3d 716, 720 (8th

Cir. 2002).

Trooper Hanson had a reasonable, articulable suspicion that Mr. Rodriguez might be engaged in criminal drug activity.  First, he obtained information from other investigators and officers that Mr. Rodriguez was suspected of drug trafficking. Second, his suspicions of drug activity increased based on the presence of two cell phones and the appearance of Mr. Rodriguez's eyes.   The totality of this information provided Trooper Hanson with sufficient reasonable suspicion to expand the scope of the traffic stop to include a canine sniff, conducted by Deputy Jensen and Koa.

"[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *Rederick*, 65 F.4th at 967.  "A drug detection dog is considered reliable when it has been trained and certified to detect drugs." *United States v. Winters*, 600 F.3d 963 967 (8th Cir. 2010) (quotation omitted); *accord Rederick*, 65 F.4th at 967.  "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246-47 (2013).   The sufficiency of a drug dog's alert is considered under the same "flexible, common-sense standard" as probable cause." *Rederick*, 65 F.4th at 968 (quoting *Harris*, 568 U.S. at 240).  "Even if a drug dog's 'performance record raises questions about his reliability,' . . . the issue is whether 'the totality of the circumstances present at the scene' provided probable cause to search." *Winters*, 600 F.3d at 968 (finding probable cause from the drug dog's alert and the officer's observation of the driver's body tremor, dilated pupils, and strong "chemical" odor) (citing *Donnelly*, 475 F.3d at 955).

As the magistrate judge found, because Koa was certified for the detection of narcotics, the Court can presume the dog's alert provided probable cause to search subject to any conflicting evidence presented. *Harris*, 568 U.S. at 246–47. Mr. Rodriguez contends that the magistrate judge overlooked that the dog made "numerous departures" from its training, was suspended from search activities for retraining a few months later, and "had demonstrable errors in making false drug indications contemporaneously with the November 25 search, including a false indication only the day before." (Def.'s Obj. at 8–9.)

The magistrate judge found that Koa's alleged deviations in behavior—jumping onto his hind legs to sniff the open window of the car and jumping onto Deputy Jensen—did not negate probable cause for the search of the vehicle. (R&R at 18.) She noted Deputy Jensen's testimony that Koa's alleged deviation in jumping onto his hind legs was a significant alert because the dog had never left his feet absent a narcotics odor. (*Id.*) As to the deviation of jumping onto Deputy Jensen, Koa did so only after giving a final indication. (*Id.*) It was unnecessary for Koa to give only a "trained response to the odor of narcotics rather than an untrained one." *United States v. Thin Elk*, 148 F.4 595, 600 (8th Cir. 2025) (citation omitted). Deputy Jensen testified to Koa's alerts (e.g., snapping his head, jumping up to sniff in an open window, no longer following Deputy Jensen's hand to sniff odors, and laying down briefly). (R&R at 19.) The Court agrees with the magistrate judge that Koa's training records, certification, Deputy Jensen's testimony, and other evidence in the record supports a finding that Koa's alerts and indications provided probable cause to search the vehicle.

As to Koa's false indication a day before the search, the magistrate judge noted that Koa's records demonstrated that he had performed accurately on November 17, 2024, and the

morning of November 24, 2024. (R&R at 19.) Magistrate Judge Elkins found that without specific evidence of Koa's overall accuracy before the stop, evidence from Deputy Jensen's testimony, Koa's records and certification, and a video showing Koa's behavior, supported a finding that Deputy Jensen credibly identified Koa's alerts and indications during the stop and provided probable cause for the search. (*Id.* at 19–20.) The fact that Koa required retraining approximately three months after the sniff in this case does not alter the Court's finding of probable cause. At issue is the totality of circumstances present at the scene of the search, *Winters*, 600 F.3d at 968, and, moreover, Deputy Jensen testified that after retraining, Koa was recertified. (Supp. Hr'g Tr., Vol. II at 89.)

Thus, the Court agrees with Magistrate Judge Elkins that even if Mr. Rodriguez demonstrated that Koa had low accuracy, the totality of the circumstances here, combined with law enforcement officers' collective knowledge, provided probable cause to search the Grand Am. *Winters*, 600 F.3d at 968. At the time of the stop, law enforcement officers knew of Mr. Rodriguez's communications with Mr. Diaz-Aguilar based on the seizure of Diaz-Aguilar's phones. Law enforcement officers also knew of Mr. Rodriguez's past criminal history involving drug distribution, found that his Cash App activity was consistent with drug sales, and knew that he traveled to locations where his Cash App payors lived. In addition, law enforcement knew that Mr. Rodriguez met with Mr. Diaz-Aguilar a few days before the stop and that he was traveling in the direction of his previous Cash App payors when officers stopped him with two cell phones in his possession. These facts formed the officers' collective knowledge, imputed to Trooper Hanson, and combined with Koa's alert, established probable cause to search the Grand Am. For all of these reasons, the Court

overrules Mr. Rodriguez's Objection as it relates to probable cause to search the vehicle.

## III.    CONCLUSION

Based upon the foregoing, and all the files, record, and proceedings herein, **IT IS HEREBY ORDERED** that

1. Defendant's Objection [Doc. No. 165] to the December 11, 2025 Report and Recommendation is **OVERRULED**.

2. Magistrate Judge Shannon G. Elkins' December 11, 2025 Report and Recommendation [Doc. No. 160] is **ADOPTED**.

3. Defendant's Motion to Suppress Evidence Derived from Motor Vehicle Search [Doc. No. 92] is **DENIED**.

4. Defendant's Motion to Suppress Evidence Derived from Search of Cell Phones [Doc. No. 93] is **DENIED**.

Dated: January 20, 2026

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge